**EXHIBIT B**

Electronically Filed
9/12/2019 4:28 PM
Third Judicial District, Payette County
Betty Dressen, Clerk of the Court
By: Julie Anderson, Deputy Clerk

Vaughn Fisher, ISB No. 7624
Jeremiah Hudson, ISB No. 8364
FISHER RAINEY HUDSON
950 W. Bannock St., Ste. 630
Boise, ID 83702
Email: vaughn@frhtriallawyers.com
Email: jeremiah@frhtriallawyers.com
Telephone: (208) 345-7000
Facsimile: (208) 514-1900
*Attorneys for Plaintiffs*

Reagan E. Bradford, OK Bar Assoc. No. 22072
Lanier Law Firm
Oklahoma Office:
100 E. California Ave., Suite 200
Oklahoma City, OK 73104
Telephone: (405) 820-4401
Email: Reagan.Bradford@LanierLawFirm.com
*Attorney for Plaintiffs Pro Hac Vice Admission Pending*

Rex A. Sharp, KS No. 12350
Rex A. Sharp, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
Telephone: (913) 901-0505
Facsimile: (913) 901-0419
Email: rsharp@midwest-law.com
*Attorney for Plaintiffs Pro Hac Vice Admission Pending*

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF PAYETTE

| | |
|---|---|
| THOMAS G. ROLAND, MARCIA R. ROLAND, RANDALL C. KAUFFMAN, THANA M. KAUFFMAN, BRETT L. MOORE, KATHLEEN A. MOORE, RICHARD PETERSON, GREGORY SEMON, and TERRI SEMON, on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>ALTA MESA RESOURCES, INC.; ALTA MESA SERVICES, LP, ALTA MESA HOLDINGS, LP, AM IDAHO LLC, HIGH MESA HOLDINGS, LP, HIGH MESA SERVICES, LLC, and NORTHWEST GAS PROCESSING, LLC, (including affiliated predecessors and affiliated successors),<br><br>Defendants. | CV38-19-0201<br>Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>Wiebe, Susan E. |

**CLASS ACTION COMPLAINT - 1**

## CLASS ACTION COMPLAINT

Thomas G. Roland, Marcia R. Roland, Randall C. Kauffman, Thana M. Kauffman, Brett L. Moore, Kathleen A. Moore, Richard Peterson, Gregory Semon, and Terri Semon ("Plaintiffs"), on behalf of themselves and the Class of all other persons similarly situated, file this Class Action Complaint against Alta Mesa Resources, Inc., Alta Mesa Services, LP, Alta Mesa Holdings, LP, AM Idaho LLC, High Mesa Holdings, LP, and High Mesa Services, LLC ("Defendants"), and allege and state as follows:

## SUMMARY OF ACTION

1.      Plaintiffs and the Class bring claims against Defendants concerning Defendants' actual, knowing, and willful underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Idaho. Defendants manipulated royalty accounting methods by calculating royalty on a net price rather than a gross price, by taking midstream deductions from royalty that the oil and gas leases do not expressly authorize, by failing to account for and pay royalties on all products produced, used, or sold, and by engaging in transactions with affiliates which reduced royalty paid, all as more fully described below.

2.      Much litigation has arisen in gas-producing states about who—lessees or lessors—bears the midstream service expenses incurred to make marketable products from the gas produced from the wells. The law in the majority of gas-producing jurisdictions (including the law applicable to the federal government, which is the largest gas-producing jurisdiction by far) requires the lessees, such as Defendants, to bear all of the costs of preparing the gas for market, i.e. placing gas and its constituents into "Marketable Condition." The issue has not been decided under Idaho law. This case provides that opportunity.

CLASS ACTION COMPLAINT - 2

3.       The Idaho Oil and Gas Conservation Act, I.C. § 47-309, et seq., will inform the issues because it applies to all lands located in the state. I.C. § 47-313. Section 47-331 of the Act recognizes the lessee's royalty payment obligation is "of the essence in the lease contract" and requires payment on "all production sold from the leased premises" except for on-lease consumption, which is not at issue here. Two definitions from the Act have particular relevance:

> "'End purchaser' means a third-party, arm's-length purchaser of oil, gas or condensate that is ready for refining or other use, or a third-party, arm's-length purchaser of other fluid or gaseous hydrocarbons that have been separated in a processing facility." I.C. § 47-310(6).

> "'Market value' means the price at the time of sale, in cash or on terms reasonably equivalent to cash, for which the oil and gas should bring in a competitive and open market under all conditions requisite for a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus from either party. **The costs of marketing, transporting and processing oil and gas produced shall be borne entirely by the producer, and such cost shall not reduce the severance tax directly or indirectly.**" I.C. § 47-310(11) (emphasis added).

These two Idaho statutory definitions emphasize that royalty is to be paid based on "third-party, arm's-length" sales in "a competitive and open market" without deduction for "the costs of marketing, transporting and processing"—this is precisely the essence of the implied duty to market and aligns with Defendants' statutory duty to report on the check stub the "Royalty owner's share of the total value of sales attributed to the [royalty] payment before any deductions" and provide an itemized list of any deductions in addition to the severance tax deduction. I.C. § 47-332(h) and (j) (emphasis added). The Act also provides for interest at the rate of 12% on royalty not paid within sixty days of its due date. I.C. §§ 47-331(3) & 28-22-104(1). The damages in this case will be significant.

**CLASS ACTION COMPLAINT - 3**

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendants pursuant to Idaho Code § 5-514 because they transact business within Idaho and some of their wrongful acts toward the Class occurred within Payette County, Idaho.

5.      This Court has jurisdiction over this matter pursuant to Idaho Code § 1-705.

6.      Venue is proper in this Court pursuant to I.C. § 5-404.

## PARTIES

7.      Plaintiff Thomas G. Roland and Marcia R. Roland are citizens of Idaho. Plaintiffs own royalty interests pursuant to an oil and gas lease (which lease is in Defendants' possession) in Defendants' operated wells that produce gas in Payette County, Idaho.

8.      Plaintiffs Randall C. Kauffman and Thana M. Kauffman are citizens of Idaho. Plaintiffs own royalty interests pursuant to oil and gas leases (which leases are in Defendants' possession) in Defendants' operated wells that produce gas, such as the Kauffman 1-9 and Kauffman 1-34 wells, in Payette County, Idaho.

9.      Plaintiffs Brett L. Moore and Kathleen A. Moore are citizens of Idaho. Plaintiffs own royalty interests pursuant to an oil and gas lease (which lease is in Defendants' possession) in Defendants' operated wells that produce gas, such as the ML Investments 1-3 and ML Investments 2-3 wells, in Payette County, Idaho.

10.     Plaintiff Richard Peterson is a citizen of Idaho. Plaintiff owns royalty interests pursuant to an oil and gas lease (which lease is in Defendants' possession) in Defendants' operated wells that produce gas in Idaho.

**CLASS ACTION COMPLAINT - 4**

11.     Plaintiffs Gregory Semon and Terri Semon are citizens of Idaho. Plaintiffs own royalty interests pursuant to an oil and gas lease (which lease is in Defendants' possession) in Defendants' operated wells that produce gas in Payette County, Idaho.

12.     Defendant Alta Mesa Resources, Inc. is a corporation organized under Delaware law with its principal place of business in Texas. It may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

13.     Defendant Alta Mesa Services, LP is a limited partnership organized under Texas law and may be served with process by serving its registered agent, CT Corporation System, 921 S. Orchard Street, Suite G, Boise, ID 83705.

14.     Defendant Alta Mesa Holdings, LP is a limited partnership organized under Texas law and may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

15.     Defendant AM Idaho LLC is a limited liability company organized under Texas law and may be served with process by serving its registered agent, CT Corporation System, 921 S. Orchard Street, Suite G, Boise, ID 83705.

16.     Defendant High Mesa Holdings, LP is a limited partnership organized under Delaware law and may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

17.     Defendant High Mesa Services, LLC is a limited liability company organized under Delaware law and may be served with process by serving its registered agent, CT Corporation System, 921 S. Orchard Street, Suite G, Boise, ID 83705.

**CLASS ACTION COMPLAINT - 5**

18.     Defendant Northwest Gas Processing, LLC, is a limited liability company organized under Delaware law and may be served with process by serving its registered agent, CT Corporation System, 921 S. Orchard Street, Suite G, Boise, ID 83705.

19.     Defendants and their affiliated predecessors, successors, and current and past employees, agents, representatives, attorneys, or others acting on their behalf and all those to whose prior leasehold interests they have succeeded and for whom they are legally liable whether by merger, assignment, or otherwise shall herein collectively be known as "Defendants."

20.     The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Defendants' business or affairs, and within the scope of their employment or agency with Defendants.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this action pursuant to I.R.C.P. 77(a) and (b)(3) on behalf of the following class (the "Class"):

> All persons who are or were royalty owners in Idaho wells where Defendants Alta Mesa Resources, Inc., Alta Mesa Services, L.P., Alta Mesa Holdings, L.P.; AM Idaho, LLC, High Mesa Holdings, L.P., and High Mesa Services, LLC (including their affiliated predecessors and affiliated successors, collectively "Alta Mesa") are or were the operator (or a working interest owner who marketed its share of gas and directly paid royalties to the royalty owners) from January 1, 2014 to the date Class Notice is given ("Class Period"). The Class claims relate to royalty payments for gas and its constituents (such as residue gas, natural gas liquids, or drip condensate).

> Excluded from the Class are: (1) agencies, departments or instrumentalities of the United States of America, including but not limited to the U.S. Department of the Interior (the United States, Indian tribes, and Indian allottees); (2) Defendants, their affiliates, predecessors, and employees, officers, and directors; (3) any entity that produces, gathers, processes, or markets gas, and its affiliates; (4) overriding royalty owners and others whose interest was carved out from the lessee's interest; and, (5) royalty owners only to the extent they take gas in-kind, if any.

**CLASS ACTION COMPLAINT - 6**

22.     Defendants operate or have operated gas-producing wells in Idaho in which Plaintiffs and the Class hold royalty interests ("Class Wells").

23.     Defendants hold a working interest in these Class Wells, with at least one, and usually multiple, royalty owners for each Class Well.

24.     The members of the Class are so numerous that joinder of all members is impracticable.

25.     Defendants have within their possession or control records that identify all persons to whom they (including affiliated predecessors and those for whom they are legally responsible) pay or have paid royalties from Class Wells during the Class Period, such that the Class is ascertainable.

26.     The questions of fact or law common to Plaintiffs and the Class include, without limitation, one or more of the following:

> a.     Whether the Plaintiffs and the Class are beneficiaries of the implied Marketable Condition Rule (MCR), which requires Defendants to sever the gas from the ground and to prepare the gas for market at Defendants' sole expense.
>
> > i.     If so, whether: 1) the midstream expenses of gathering, compression, dehydration, treatment, and processing ("Midstream Expenses" or "GCDTP") are expenses associated with preparing the gas for market such that none of them should have been deducted from royalties, even though they were; or 2) whether the market for gas occurs before GCDTP are incurred such that the only claim is for excessive deductions of Midstream Expenses.
> >
> > ii.     If not, whether the Class members were party to a lease that expressly allows deduction of all GCDTP (a/k/a "Express Deduction Lease" or "ED Lease"), such that these Class members have a claim only for excessive deductions of Midstream Expenses, and if so, whether the Midstream Expenses actually deducted were excessive in amount.

**CLASS ACTION COMPLAINT - 7**

b.      Whether Defendants paid royalty to Plaintiffs and members of the Class for all valuable constituents coming from their wells and which inured to Defendants' benefit either:

  i.      through credit toward payment of the Midstream Expenses; or

  ii.     by in-kind contractual consideration to a midstream company (such as allowing the processor to keep all or a percentage of drip condensate, Residue Gas, fractionated NGLs, plant fuel, or FL&U).

c.      Whether Defendants (including any of their affiliates) paid royalty to Plaintiffs and members of the Class based on a starting price below what Defendants or their affiliates received in arm's-length sales transactions.

d.      Whether class-wide damages can be calculated for Plaintiffs' theories of liability.

27.      Each Plaintiff is typical of other members of the Class because Defendants pay royalty to each Plaintiff and other Class members using a common method. Defendants pay royalty based on the net revenue Defendants receive under gas contracts, which terms royalty owners do not know or approve.

28.      Because gas is not in marketable condition at the well, Defendants enter gas contracts for the GCDTP services necessary to place the gas and its constituent parts into marketable condition, so the products can be sold into recognized, active, and competitive commercial markets.

29.      Each Plaintiff will fairly and adequately protect the interests of the members of the Class. Each Plaintiff is a royalty owner to whom Defendants pay royalty. Each Plaintiff understands the duties of a Class representative. Each Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

30.      This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class, and those common questions predominate over any questions solely affecting individual members of such Class. *See* ¶24, above. Experts, rather than

**CLASS ACTION COMPLAINT - 8**

individual Class members, will present evidence or testify based on documents in Defendants' or third parties' possession, custody, or control, to establish Defendants' liability to or damages sustained by Plaintiffs and members of the Class. Individual members of the Class need not testify to establish either Defendants' liability or class-wide damages.

31.    Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow many similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts, and/or Defendants. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

32.    Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of the Class. Joinder of all Class members would be either highly impracticable or impossible. And the amounts at stake for individual Class members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Defendants will likely retain the benefit of their wrongdoing.

## THE LEASES

33.    The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lease allows the lessee to take the minerals from the lessor's land. As consideration, the lease splits the value of the gas produced

from a well between the lessor and the lessee. In earlier leases, the typical split was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. But, with the development of new technology and efficient equipment, the risk of finding oil and gas has diminished over time and the splits have increased to 3/16th or even 1/4th of the value to the lessor and 13/16ths or 3/4th of the value to the lessee.

34.     The leases permit Defendants/Lessees to explore for and develop oil and gas wells on the lands owned by Plaintiffs and the Class Members ("Class Leases").

35.     As consideration for the right to produce oil and gas from these lands, the Class Leases obligate Defendants to pay monthly royalty on the products produced from the oil and gas taken. Plaintiffs' claims in this case concern only gas production, not oil production.

36.     The obligation to pay royalty on gas is found in the royalty clause of the lease form. In this case four (4) of six (6) leases provide:

> 2nd. To pay Lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, three-sixteenth (3/16) of the **gross proceeds** received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than three-sixteenth (3/16) of the **actual amount received** by the Lessee said payments to be made monthly.

The fifth lease provides:

> 2nd. To pay Lessor for gas including casinghead gas, condensate or other gaseous substances of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, one-sixth (1/6) of the **gross proceeds,** calculated based on the price received at the point of sale, for the gas sold or used off the premises, or in the extraction of gasoline or other products therefrom, but in no event more than one-sixth (1/6) of the **actual amount received** by the Lessee, said payments to be made monthly.

And the sixth lease provides:

> 2nd. To pay Lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products

therefrom, three-sixteenth (3/16) of the **actual amount received by the Lessee** said payments to be made monthly.

The above emphasis has been added and does not appear in the actual leases.

37.     None of these leases expressly permit the deduction of any amounts from the "gross proceeds" or the "actual amount received by the Lessee" for products manufactured from the gas produced from Plaintiffs' wells.

38.     Other royalty owners in Idaho wells have leases, like those of Plaintiffs, that do not expressly authorize the deduction of amounts from the royalty Defendants owe, making Plaintiffs' legal claims typical of the Class's claims.

39.     A few royalty owners in Idaho wells have leases that expressly authorize the deduction of amounts from the royalties that Defendants owe; but they do not expressly authorize Defendants' use of affiliates to reduce the amount of royalty owed. Plaintiff Peterson has this type of lease. The lease expressly authorizes lessor's share of the proceeds to "bear its proportionate share of the cost of compressing, dehydrating, and otherwise treating such gas or casinghead gas to render it marketable or useable and its proportionate share of the cost of gathering and transporting such gas and casinghead gas from the mouth of the well to the point of sale." But the lease nowhere permits Defendants to reduce royalty by selling the gas produced to affiliated entities that later sell the gas in arm's length transactions and pocket the difference. Such self-dealing breaches the implied duty to market which includes both the mutual benefit rule and the duty to get the best reasonable price recognized in every lease, and which prohibits self-dealing affiliate sales. Plaintiff Peterson is willing to serve as the class representative for royalty owners with only this claim.

40.     None of the Class Leases permit Defendants to recover construction costs or reduce operational losses from the small royalty fraction; those costs come only from the much larger

working interest fraction. To the extent Defendants have offset their costs against royalties, Plaintiffs seek to recover those amounts in this action.

## ROYALTY UNDER THE LEASES

41.     The leases also obligate Defendants to pay royalty for "gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom."

42.     Yet, Defendants fail to pay royalty on all of the gas (with all of its constituents) produced, sold, or used. This failure to pay royalty on all of the gas and its constituents produced, sold, or used breaches express terms of the lease.

43.     In their gas contracts, Defendants also allow the gatherers or processors or other service providers, whether affiliated with Defendants or unaffiliated, to use gas from the wells as fuel to power equipment on the midstream gathering system and at the processing plant.

44.     The Class Leases nowhere permit Defendants to give away gas or its constituents. To the contrary, the Class Leases provide for royalty on the gas "produced," which includes all, not just some, of the gas coming out of the Class Wells.

45.     Defendants pay no royalty to Plaintiffs or the Class on the gas lost, used as fuel gas, or otherwise given away.

46.     The leases also obligate Defendants to pay royalty on the "gross proceeds" and "actual amount received by the Lessee" from the sale of the products manufactured from the gas taken from Plaintiffs' and the putative Class Members' wells. Yet Defendants calculate royalty based on the "net" value, meaning the gross value of the products minus the expenses incurred to transform the gas into those products, which are then sold into established commercial markets for the particular product.

47.     Defendants' method for calculating royalty to Plaintiffs and the Class is subject to uniform accounting procedures.

48.     Defendants' payment of royalty on net, rather than gross, value breaches the express obligation to pay royalty on the gross proceeds or actual amount received by the Lessee.

49.     These practices result in Defendants' keeping more revenue from the sale of gas products than the fractional amount allowed under the Class Leases, which is why they use these practices.

### PLACING GAS IN MARKETABLE CONDITION: WHO BEARS THE EXPENSE?

50.     Gas taken from the Class Wells is moved in small pipelines on the leased premises to a meter run (where it is measured for volume and a quality sample taken). It then enters gathering lines that aggregate gas produced from multiple wells. The gas is commingled at the inlet to the gathering system such that the molecules and constituents cannot be traced back to any one well. The gas becomes a single commingled gas stream.

51.     This "raw" or "dirty" gas stream contains various valuable elements and substances along with worthless and deleterious substances, which must be segregated to achieve marketable condition. The valuable gas components must be segregated from: (a) the "dirty" gas stream, (b) the worthless and deleterious components, and (c) each other, to achieve the fungible quality necessary for trading in a market. The "clean" fungible product is then priced and completely sold in an established commercial market for that product.

52.     The initial gas conditioning process involves separating the gas from the other liquids (oil and water). A diagram showing this process is below:



53.    The "dirty" gas comes out of the wellhead and flows into the free water knockout or separator. Being lightest, the gas flows out the top of the separator. Being heaviest, the water flows out of the bottom of the separator to be disposed of. The oil flows out of the middle of the separator into the heater treater, where the oil, gas, and water are further separated, with gas again flowing out the top, water flowing out of the bottom, and the oil flowing into storage tanks on or near the lease.

54.    While it is possible to "sell" dirty gas and its valuable constituent parts before it is "clean" commercial grade or marketable condition, such as to a local irrigator, less than 2% of the gas is sold as irrigation gas. In those instances, however, the products are priced at commercial grade so the lessees capture the value of the gas products that could have been produced from the gas used as irrigation gas.

55.     None of the gas from the Class Wells was produced and marketed during the Class Period to be sold only to local irrigators, and none of the Class gas is sold that way, rather it is marketed under gas contracts.

### Gas Contracts for Midstream Services

56.     To manufacture products from the dirty gas, Defendants enter gas contracts, which detail the GCDTP services (including TF&S for natural gas liquids) required to transform the dirty gas into "clean" fungible products. The gas contracts also spell out the consideration Defendants must pay for those services.

57.     The gas contracts also specify where, how, and at what price the "clean" fungible products, like Residue Gas and natural gas liquids ("NGLs") are to be sold. The contracts will specify an Index pool for the sale of Residue Gas and the OPIS market for the sale of NGLs.

58.     Plaintiffs are not parties to these contracts, nor are they privy to them. Most of the contracts are considered proprietary and, by their terms, are confidential among the parties to them.

59.     The below diagram provides an overview of the midstream services process.



Plaintiffs allege Defendants' practice of allowing both monetary and in-kind deductions for "Midstream Services," i.e. between the gathering line inlet and the interstate pipeline inlet, breached the leases. To Plaintiffs' knowledge, Defendants do not take deductions from royalty for expenses incurred upstream, i.e. before the gathering line inlet.

60.     As the commingled mixture of "dirty" gas from each well enters the gathering line, it flows into a meter run where the mixture is measured for both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). The gas producer or gatherer must constantly maintain the meter run to record accurate measurements. Companies charge lessees for gathering the dirty gas, i.e. a gathering expense (G).

61.     Gathering pipelines, often made of metal, are susceptible to corrosion by water vapor (and other corrosive gases) in the commingled "dirty" gas stream. Water vapor does not burn and literally waters down the burning capability of the gas. So, a glycol dehydrator is used to remove the water vapor. This results in a dehydration expense (D).

62.     Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are installed to move the gas from the gathering line inlet to the processing plant. These compressors are expensive and require fuel to operate. This results in a compression expense (C) and loss of volume for gas used as fuel.

63.     Gas condensate (gas condensed into liquid as it cools and is pressurized, a/k/a "Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later. Sometimes lessees, like Defendants, pay no royalty on the revenue generated from the sale of the Drip Condensate.

64.     Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U"). Lessees, like Defendants, pay no royalty on the volume of L&U.

### Natural Gas Processing

65.     When enough of the dirty gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

66.     Lessees, such as Defendants, use gas processing plants that either they or a third party own.

67.     In this case, all of the gas from the Class Wells is processed at the Highway 30 Processing Facility owned by Northwest Gas Processing, LLC, 4241 Hwy 30S, New Plymouth, ID 83655 ("the Plant").

68.     The Plant removes impurities that remain in the mixture, such as carbon dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T).

69.     The final cost, processing (P), involves services to transform the gas mixture into methane gas (also called "residue gas"), NGLs raw make, and in some areas, crude helium.

     a.     Methane must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission ("FERC") which is called "pipeline quality gas."

     b.     The raw make NGLs are used as a feedstock in the petrochemical and oil refining industries. They are a more valuable commodity than methane. To separate the NGLs from the gaseous mixture, they undergo a "Cryogenic" or cooling process that involves temperatures lower than minus 150°F. The NGLs move into a liquids pipeline and are processed by a fractionator into their marketable products: ethane; propane; butane;

isobutene, natural gasoline; and pentanes plus. In the gas contracts, this process incurs a "T&F" or "fractionation" fee, even though lessees sometimes give away the NGLs in keep-whole agreements as consideration for other services the midstream company provides.

70.     This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Lessees, like Defendants, do not pay royalty on plant fuel, even though it comes from Class Wells.

71.     At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas); and, (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). But none of these products are commercially marketable at that point.

### Marketable Condition for the Products

72.     *Methane Gas.* Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

73.     *NGLs.* The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products – ethane, propane, butane, isobutene, natural gasoline, etc. In computing royalty for NGLs, Defendants improperly deduct processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs.

74.     *Drip Condensate.* Drip Condensate is recovered on the gathering lines and at the inlet to the processing plant and is essentially in marketable condition when collected.

75.     *Other Products.* In some areas of the country, but seemingly not Idaho, helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other areas of the country produce sulfur and carbon dioxide in commercial quantities. When such products are

available in commercial quantities, processing and treatment plants recover these valuable constituents but lessees pay little or nothing to the royalty owners. Royalty owners should be paid for the gas and all constituents taken from their mineral estate.

76.     Gas and its constituent parts are marketable products only when they are in the physical condition to be bought and sold in a commercial marketplace.

77.     All other gas and its valuable constituents, which includes all Class gas, was sold at commercial grade for a commercial price, or not sold at all, either used as fuel or given away to the Midstream Service Provider as an in-kind fee for services.

### Sale of Products

78.     To turn the marketable products into money, the producer sells them (or contracts to have them sold) in the commercial market place in arm's length transactions. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at the OPIS market, and any other marketable products at the prices established by their respective commercial markets. Lessees, like Defendants, attempt to obscure this fact with self-serving language in gas marketing contracts about title transfer or even by creating a wholly owned affiliate to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

79.     The "starting price" for gas products is achieved, as it must be, at a commercial market price. All of the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. The difference stems from Defendants' market power to, over time, obtain above "Index" or "OPIS" price in its arm's length sale. Whichever starting price is used in an arm's

length transaction, that price is the highest and best reasonable price for the valuable gas products. If Other Products are also produced, they are and must be also priced in a commercial market.

80.    As previously mentioned, lessees sometimes form affiliates to handle the gas they produce and to obtain an economic advantage. But gas contracts between affiliated entities are not arm's-length sales in a commercial market. Instead, the later arm's-length sale by the affiliate to a third-party in the commercial market is the true sale that should be used as the starting price for marketable condition gas products.

        a.    Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create what appears to be a market where none truly exists so they may justify deducting costs from royalty, or not paying for all of the gas or constituent products produced; (2) charge "marketing fees" to royalty owners even though the lessee is already obligated under the lease to prepare the gas for market and market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price and not the higher affiliate/third party price.

        b.    WASP involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price." Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third-party arm's length sale prices.

81.    Fictitious "sales" (a/k/a sham sales, conditional sales, or paper title transfers) are created by lessees to pass off a non-commercial market sale as if it should be the starting point for

royalty payments. But none of these efforts comport with economic reality or are in good faith with respect to royalty owners.

## THE MANY DIFFERENT WAYS DEFENDANTS UNDERPAY ROYALTY OWNERS

82.     The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are firmly kept in the exclusive control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways that royalty owners are underpaid on their royalty interests, and they never know it. The common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

83.     Defendants represent the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed.

84.     Defendants underpay royalty to Plaintiffs and other Class Members in one or more of the following ways:

   a. <u>Residue Gas</u>. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. Here, however, Defendants use their affiliate Northwest Gas Processing, LLC to process the gas. Instead of paying on a gross competitive price in an arm's-length transaction, Defendants pay on a net price after directly taking or allowing midstream companies to indirectly take Midstream Services deductions (both monetary fees and in-kind volumetric deductions).

b.      NGLs. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). Here, however, Defendants use their affiliate Northwest Gas Processing, LLC to process the NGLs. Instead of paying royalty on that gross competitive price in an arm's length transaction, Defendants pay royalty (i) for only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel); (ii) after deducting processing fees and expenses (perhaps keeping in-kind a Percentage of the Proceeds ("POP") of the fractionated NGLs as payment for the processing services); and, (iii) after reducing payment by T&F.

c.      Drip Condensate. Plaintiffs and Class Members' wells produce heavy hydrocarbons that condense in the pipeline. Defendants (or a third-party on behalf of Defendants (gatherers and/or processors)) recover those hydrocarbons for sale. Defendants fail to pay any royalty for that Drip Condensate.

d.      Affiliate Transactions. Defendants entered into non-arm's-length transactions with their midstream affiliates, the terms of which were designed to deprive Plaintiffs and the Class Members of their rightful royalties, while simultaneously generating unlawful profits for Defendants.

e.      Monetizing Midstream Service Operations. Defendants' affiliated Kingfisher Midstream, LLC was sold for $1.55 Billion. https://www.businesswire.com/news/home/20180209005632/en/ARM-

Energy-Holdings-LLC-Announces-Completion-Sale. Even though royalty owners effectively paid for 3/16ths of the midstream operations, they did not receive their 3/16th of the $1.55 Billion sale proceeds. Defendants also formed Alta Mesa Resources, Inc., which was an amalgamation of Alta Mesa Holdings, LP; Silver Run Acquisition Corp. II, and Kingfisher Midstream LLC. The affiliate transactions involved are too convoluted to describe here; however, Plaintiffs put Defendants on notice that affiliate transactions are at issue in this case if they have been used to prevent royalty owners from receiving full royalty payments.

85. Defendants underpay all other Class Members, from whom Defendants are legally entitled to deduct post-production Midstream Services Costs, by taking excessive deductions under Midstream Services Contracts that allow excessive monopoly charges for GCDTP services.

## ACTUAL, KNOWING AND WILLFUL
## UNDERPAYMENT OR NON-PAYMENT OF ROYALTIES

86. The underpayment and non-payment of royalties are done with Defendants' actual and willful knowledge and intent.

87. However, Defendants continue to improperly pay royalty.

88. In fact, Defendants have resolved the same claims before and are well familiar with the fact that many other producers have resolved the same claims for hundreds of millions, if not billions, of dollars or have changed their royalty payment practices to cease improperly deducting GCDTP from royalty and for not paying royalty the full amount of royalty owed.

89. Defendants continue their improper payment practices with actual and willful knowledge and intent.

## COUNT I – BREACH OF LEASE

90.     Plaintiffs and the Class incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

91.     Plaintiffs and the other Class Members entered into written, fully executed, oil and gas leases with Defendants, and those leases include implied covenants requiring Defendants to prepare the gas and its constituent parts for market at Defendants' sole cost. The leases also place upon Defendants the obligation to properly account for and pay royalty to royalty owners under the mutual benefit rule, the best reasonable price, and good faith and fair dealing.

92.     At all material times, Plaintiffs and the Class have performed their terms and obligations under the leases.

93.     Defendants conspired to and did breach the leases, including the express terms and/or implied covenants, by their actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream and in using transactions with affiliates in calculating royalties.

94.     As a result of Defendants' breaches, Plaintiffs and the Class have been damaged through underpayment of the actual amounts due for which they are entitled to recover in an amount to be proven at trial.

## COUNT II – FRAUD BY OMISSION

95.     Plaintiffs and the Class incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

96.     The Defendants intentionally made omissions regarding the price, volume, various products produced, and deductions to suggest that the price was a third-party commercial price

without hidden deductions, the volumes were accurately measured without volumetric deductions, and that deductions would be shown on the check stub when in fact they were not.

97.     The Defendants conspired to make omissions regarding the price, volume, various products produced, and deductions to suggest that the price was a third-party commercial price without hidden deductions, the volumes were accurately measured without volumetric deductions, and that deductions would be shown on the check stub when in fact they were not.

98.     By creating and mailing misleading check stubs to the Class, Defendants have fraudulently and deceitfully misled the Class into believing that the Class Members had been paid on the full value of the production from their wells.

99.     Defendants knew that their representations and omissions on the monthly check stubs were at least ambiguous and created a false impression of the actual facts to the royalty owners.

100.    Defendants were deceitful by suggesting, as a fact, that the volume, price, value and other statements were as set forth on the monthly check stubs when those statements were not true. Defendants knew the statements were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

101.    Defendants acted intentionally or recklessly in disregard of the rights of Plaintiffs and the Class Members, on a uniform basis, by not properly paying royalty owners, by deceiving them with check stubs that were misleading, and by failing to correct Defendants' royalty payment practices.

102.    As a direct and proximate result of Defendants' tortious fraudulent omissions, Plaintiffs and the Class were underpaid monthly for royalties and are entitled to recover actual damages in an amount to be proven at trial.

103.    In addition, the money wrongfully obtained by Defendants as a result of what should have been paid to Plaintiffs and the Class should be held in constructive trust along with monetary interest for Plaintiff and the Class.

## COSTS AND ATTORNEYS' FEES

104.    The Plaintiffs have retained the services of FISHER RAINEY HUDSON, SHARP LAW and THE LANIER LAW FIRM and should be awarded attorneys' fees and costs against Defendants pursuant to I.C. §12-120.

## DEMAND FOR JURY TRIAL

105.    Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an Order and Judgment against Defendants as follows:

a.     The Court determine that this action may be maintained as a class action and reasonable notice of this action will be given to members of the Class;

b.     The Court appoint Plaintiffs as the class representatives, and Plaintiffs' Counsel as class counsel;

c.     The Court award Plaintiffs and the Class damages for actual damages for breach of lease, fraud by omission and interest as set prescribed by I. C. §28-22-104;

d.     The Court grant Plaintiffs and the Class their costs of prosecuting this action together with reasonable attorneys' fees;

e.     The Court grant such other relief as this Court may deem just, equitable and proper.

DATED this __1__ day of March 2019.

Respectfully Submitted,

Vaughn Fisher
**COUNSEL FOR PLAINTIFF**

**CLASS ACTION COMPLAINT - 27**